## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

|  |  |  |
|---|---|---|
| | * | |
| **LOCKHEED MARTIN CORP.,** | * | |
| | * | |
| Plaintiff | * | |
| | * | |
| v. | * | Civil Case No. RWT 05-1189 |
| | * | |
| **DEFENSE CONTRACT AUDIT AGENCY,** | * | |
| | * | |
| Defendant | * | |
| | ******* | |

## <u>MEMORANDUM OPINION</u>

Lockheed Martin Corp. ("Lockheed") brings this action to prevent the Defense Contract Audit Agency ("DCAA") from rescinding Lockheed's "direct billing" authority or from causing payments due to Lockheed under its many contracts with the United States Department of Defense to be withheld.   In particular, Lockheed seeks declaratory and injunctive relief under the Administrative Procedure Act, 5 U.S.C. § 701 et seq., on the grounds that DCAA's threatened actions are "arbitrary, capricious, an abuse of discretion, and otherwise contrary to law and regulation." Complaint at 1.  Before this Court is a motion by DCAA to dismiss the action or in the alternative to transfer to the United States Court of Federal Claims, a cross-motion by Lockheed for summary judgment, and a cross-motion by DCAA for summary judgment.   For the reasons discussed below, this Court holds that it lacks subject-matter jurisdiction and grants DCAA's motion to dismiss the action.

I

With nearly 130,000 employees and annual sales of over $35 billion, Lockheed is the largest defense contractor in the United States.   Complaint ¶ 1; D.'s Cross-mot. at 1.   Lockheed has

1

hundreds of contracts with the federal government.  *Id.*

DCAA is a government agency within the Department of Defense that is responsible for performing audits of defense contracts, including Lockheed's.  Complaint ¶ 2.  The Defense Contract Management Agency ("DCMA") is another agency of the Department of Defense, not named as a defendant, whose job is to administer contracts that companies such as Lockheed enter into with the Department of Defense.  D.'s Cross-mot. at 16.  Although DCAA audits government contractors, DCAA auditors report to "contracting officers" who work for DCMA, and those contracting officers frequently coordinate audits and the resulting negotiations.  *Id.*

Large, long-term government contractors such as Lockheed have been granted the ability to "direct bill" the government for the contract work they do.  Direct billing allows government contractors that maintain certain billing systems and internal controls to bypass the ordinary auditing procedures when they submit "interim public vouchers"—periodic bills for ongoing government contracts.  *See* 48 C.F.R. § 242.803(b)(i)(C); DCAA Contract Audit Manual § 6-1007 (Oct. 12, 2005), *available at* http://www.dcaa.mil/cam.htm.  DCAA auditors then review only the "final vouchers" that contractors submit when contracts are ready to be "closed out," thereby saving both the government and the contractors some administrative overhead and allowing the contractors to be paid faster.  *Id.*  How much faster is not clear, but the parties appear to agree that direct billing speeds up payments by at least two days.  Complaint ¶ 29; D.'s Cross-mot. at 14 n.9.  Because Lockheed's contract billings total in the billions of dollars each year, the time value of a two-day delay in the payment of these bills adds up to millions of dollars a year.  P.'s Mot. at 31.

The immediate subject of this lawsuit is whether DCAA has the authority to revoke or threaten to revoke Lockheed's ability to direct bill.  However, the roots of the squabble between Lockheed and DCAA go back several years.  In 2001, Lockheed began providing the

2

telecommunications services needed under its contracts through a newly formed subsidiary, Lockheed Martin Global Telecommunications, Inc. ("LMGT"). Complaint ¶¶ 6–8, 16–17. During 2001 and 2002, LMGT provided Lockheed's telecommunications services and billed Enterprise Information Systems ("EIS"), a Lockheed subdivision, for them. *Id.* EIS then passed these costs on to the federal government by allocating them across Lockheed's and its subsidiaries' contracts. Complaint ¶ 16; D.'s Cross-mot. at 23.

In the spring of 2003, DCAA began auditing the costs transferred from LMGT to EIS. D.'s Cross-mot. at app. 9 (Aff. of George Dougherty). DCAA claims that Lockheed then refused to provide access to the records that substantiated its billings and continued to so refuse until after this Court conducted a TRO hearing on May 5, 2005. D.'s Cross-mot. at 23. Lockheed and DCAA also became embroiled in a dispute about whether LMGT could (and did) bill EIS for its expenses at a price including profit, or whether LMGT was required to pass on its expenses at cost. *Id.*

The Lockheed subsidiaries and subdivisions involved in the LMGT dispute are widely scattered across the country: LMGT was based in Maryland; its successor subdivision, Lockheed Martin Management & Data Systems ("M&DS"), is based in Valley Forge, Pennsylvania; and EIS is based in Orlando, Florida. D.'s Cross-mot. at app. 6. Consequently, DCAA and DCMA officers scattered across these locations agreed to give cognizance over the LMGT audit to George Dougherty, a DCMA contracting officer based in Camden, New Jersey, the closest DCMA office to M&DS. *Id.*

On August 3, 2004, Mr. Dougherty sent Lockheed a letter entitled "Notice of Intent to Disallow Costs" that challenged the 2001 and 2002 charges LMGT levied against EIS. D.'s Cross-mot. at app. 36–37. The letter stated that Lockheed had "refused DCAA access to actual cost data" and that Lockheed had failed to substantiate, under relevant Federal Acquisition Regulations, the

prices it had charged EIS.  *Id.*  Mr. Dougherty gave Lockheed the opportunity to respond within 30

days and stated that he planned to issue a written final decision that would disallow the LMGT costs.

*Id.*

On November 17, 2004, Mr. Dougherty, unconvinced by Lockheed's responses, followed

through on his threat and issued a "Contracting Officer's Written Decision Under FAR 42.801." *Id.*

at app. 38–42.  The decision stated that

> Since [Lockheed] has failed to show any evidence that LMGT was
> selected through competition, it is my decision that the products and services
> purchased from LMGT fail to meet the criteria of FAR 15.403-1(b)(1) for an
> exemption to cost and price data and the inclusion of profit or fee on the inter-
> company transfers are not allowable.
>     . . . For 2001 - it remains my intent to disallow an estimated aggregate
> amount of $12,207,965 representing profit or fee upon LMGT's billings to EIS.
> For 2002 - it remains my intent to disallow an estimated aggregate amount of
> $3,514,715 representing profit or fee upon LMGT's billings to EIS for that year.
> It is also anticipated that DCAA will suspend the subject cost concurrent with
> this notice.
>     This letter does not constitute an appealable Contracting Officer's Final
> Decision under the Contract Disputes Act or FAR 52.233-1 entitled Disputes.
> Rather this constitutes a written decision in confirmation of a Notice of Intent to
> Disallow costs under the provisions of FAR 42.801.  You may request an
> appealable COFD [Contracting Officer's Final Decision] interpreting the terms
> of an impacted contract upon which I will take appealable action.  Alternatively,
> you may wait and pursue a claim and appeal of the disallowance of the amounts
> indicated from the impacted prime contracts.

*Id.* at app. 42.

Following this decision, DCAA issued an internal memorandum on January 28, 2005,

regarding how DCAA was to proceed with the suspension of costs.  P.'s Mot. exh. 7.  In it, David

Laderer, the DCAA Resident Auditor in DCAA's Lockheed Martin Orlando Resident Office,

requested that DCAA offices each issue a "DCAA Form 1," a form used to provide notice to

contractors of costs suspended and/or disapproved. *Id.*; Complaint ¶ 22.  The DCAA Forms 1 would

disapprove the profit portion, and suspend the remainder, of the LMGT costs for 2001 and 2002, for

a total disapproved/suspended amount of $87,147,926.  Complaint ¶ 24.

On March 28, 2005, John Ames, a DCAA Contract Audit Coordinator, sent a letter to Lockheed notifying it of the pending DCAA Forms 1.  P.'s Mot. exh. 8.  Mr. Ames observed that "[t]he preparation of a blanket Form 1 affecting multiple contracts would normally require the rescission of Lockheed Martin's authority to direct bill for all of its contracts."  *Id.*  To avoid this, Mr. Ames presented Lockheed with three options:

- [Lockheed] could voluntarily deduct the withholding amounts from the vouchers for all impacted contracts.  The direct billing status would not change.
- [Lockheed] could voluntarily deduct the withholding amounts from the vouchers but instead of impacting all contracts the total would be taken from just the larger contracts at the larger locations.  The direct billing status would not change.
- If [Lockheed] rejects the above options then the direct billing status will be rescinded and DCAA audit offices will continue with the preparation of the DCAA Forms 1 and the related voucher withholdings at the government payment offices.

*Id.*; *see* Complaint ¶ 27.

In response, Lockheed filed the instant lawsuit against DCAA on May 2, 2005.  Lockheed alleges that (1) Mr. Dougherty is not the appropriate cognizant contracting officer to review the LMGT cost issue; (2) DCAA lacks authority to disapprove the LMGT costs prior to the establishment of final indirect cost rates for the Lockheed contracts by the DCMA contracting officer responsible for EIS; and (3) the options presented by DCAA in its March 28 letter constitute an illegal "ultimatum."  Lockheed seeks a declaratory judgment under the Administrative Procedures Act, 5 U.S.C. § 701 et seq., that DCAA's actions are "arbitrary, capricious, an abuse of discretion, and otherwise contrary to the FAR and Contract Disputes Act" and an injunction to stop DCAA from rescinding Lockheed's direct billing authority.  This Court denied Lockheed's request for a preliminary injunction after a hearing on May 5, 2005.

Before this Court now are three motions.  On May 27, 2005, in response to this court's order, DCAA filed a "Motion to Transfer to the Court of Federal Claims or, in the Alternative, Motion to Dismiss for Lack of Subject Matter Jurisdiction."  Paper No. 16 ("D.'s Mot.").  Lockheed filed a single pleading on June 20, 2005 that constituted an opposition to DCAA's motion as well as a cross-motion for summary judgment.  Paper No. 17 ("P.'s Mot.").  DCAA, in turn, cross-moved for summary judgment in its favor in its opposition to Lockheed's motion, filed on August 19, 2005.  Paper No. 25 ("D.'s Cross-mot.").

Lockheed filed a reply to DCAA's opposition to its cross-motion and an opposition to DCAA's cross-motion on September 16, 2005.  Paper No. 33 ( "P.'s Repl.").  DCAA filed a final reply to Lockheed's final opposition on September 28, 2005.  Paper No. 34 ("D.'s Repl.").

Lockheed moved to strike as untimely DCAA's cross-motion for summary judgment on August 24, 2005 and again on August 29, 2005, Paper Nos. 29, 35, & 36, but this Court denied these motions on October 5, 2005.  Paper No. 37.

This Court held oral argument on the three pending motions on October 12, 2005, and took all three under advisement.  By accompanying order, it now rules on all three.

## II

As a preliminary matter, this Court observes that among DCAA's motions is a motion to transfer this case to the United States Court of Federal Claims.  D.'s Mot. at 2.  Motions to transfer to the Court of Federal Claims have their own specialized jurisdictional statute:

> (A) The United States Court of Appeals for the Federal Circuit shall have exclusive jurisdiction of an appeal from an interlocutory order of a district court of the United States . . . granting or denying, in whole or in part, a motion to transfer an action to the [United States Court of Federal Claims] under section 1631 of this title [28 U.S.C. § 1631].
> (B) When a motion to transfer an action to the [Court of Federal Claims] is filed in a district court, no further proceedings shall be taken in the

district court until 60 days after the court has ruled upon the motion. If an appeal is taken from the district court's grant or denial of the motion, proceedings shall be further stayed until the appeal has been decided by the Court of Appeals for the Federal Circuit. The stay of proceedings in the district court shall not bar the granting of preliminary or injunctive relief, where appropriate and where expedition is reasonably necessary. However, during the period in which proceedings are stayed as provided in this subparagraph, no transfer to the [Court of Federal Claims] pursuant to the motion shall be carried out.

28 U.S.C. § 1292(d)(4).  This Court interprets this statute to mean (1) that it must dispose of DCAA's motion to transfer before it disposes of DCAA's alternative of a motion to dismiss or either of the cross-motions for summary judgment; (2) that it cannot rule in any way on the other motions until sixty days later; and (3) that when disposing of DCAA's motion to transfer, this Court should apply as binding the law of the U.S. Court of Appeals for the Federal Circuit.

Because the losing party with respect to the motion to transfer would have an appeal of right to the Federal Circuit under 28 U.S.C. § 1292(d)(4)(A), these outcomes make sense.  If this Court were to grant any of the other motions—as both parties urge it to—it would implicitly have to deny the motion to transfer as moot, and this would give rise to an awkward spectacle.  The denial of the motion to transfer would be appealable under § 1292(d)(4)(A) to the Federal Circuit and evaluated under its law, but the same order would be simultaneously appealable to the U.S. Court of Appeals for the Fourth Circuit as a final judgment under 28 U.S.C. § 1291 and evaluated under Fourth Circuit law.

This outcome is particularly troublesome because both parties agree that if the Court of Federal Claims would ever have jurisdiction over this controversy, it does not have such jurisdiction now because Lockheed's CDA claim is not yet ripe.  To whatever extent the Court of Federal Claims can ever grant Lockheed's requested relief, it can do so only after Lockheed has submitted a claim administratively to the appropriate contracting officer and has received an adverse decision (or a

deemed denial under 41 U.S.C. § 604, if no decision is issued within sixty days of Lockheed's claim). D.'s Cross-mot. at 2 n.2; P.'s Repl. at 9. Transfer to the Court of Federal Claims now would therefore be futile.

To avoid the needless delay that § 1292(d)(4)(B) thus mandates, DCAA represented at oral argument that if this Court grants the motion to dismiss, DCAA will withdraw its motion to transfer. Because, for reasons to be discussed, this Court concludes that it lacks subject-matter jurisdiction and will grant DCAA's motion to dismiss, the Court considers DCAA's motion to transfer to be withdrawn and rules on all the outstanding motions. Because, in the absence of the motion to transfer, all appeals will go to the Fourth Circuit, this Court treats that court's law as binding, although of course the decisions of other circuit courts of appeals may be highly persuasive.

III

A

Lockheed's action is a challenge to the conduct of federal officials under the Federal Acquisition Regulations, and thus falls within the scope of this Court's federal question jurisdiction under 28 U.S.C. § 1331. *See Katz v. Cisneros*, 16 F.3d 1204, 1207–08 (Fed. Cir. 1994) (holding that federal question jurisdiction exists, though an action may pertain to government contracts, where a complaint challenges the interpretation of a federal statute or regulation). Moreover, Lockheed seeks declaratory and injunctive relief, so to the extent that "there is no other adequate remedy in a court," the United States has waived its sovereign immunity and provided a cause of action under the Administrative Procedure Act. 5 U.S.C. §§ 701–706. The question of subject-matter jurisdiction here is whether there *is* an "adequate remedy" in some other court, and in particular whether this Court's jurisdiction is preempted by a grant of exclusive jurisdiction elsewhere: to the administrative dispute-resolution process and the U.S. Court of Federal Claims under the Contract Disputes Act,

41 U.S.C. §§ 601–613.  For the reasons that follow, this Court concludes that its jurisdiction is so preempted.

The Contract Disputes Act ("CDA") is a comprehensive scheme for the resolution of "[a]ll claims by a contractor against the government relating to a contract."  41 U.S.C. § 605(a).  As the Federal Circuit has observed, "when the Contract Disputes Act applies, it provides the exclusive mechanism for dispute resolution."  *Dalton v. Sherwood Van Lines, Inc.*, 50 F.3d 1014, 1017 (Fed. Cir. 1995).  Under the CDA, a government contractor desiring to make a claim against the government must file that claim in writing with the contracting officer with responsibility for the contract or contracts at issue.  41 U.S.C. § 605(a).  The decision of the contracting officer "shall be final and conclusive and not subject to review by any forum, tribunal, or government agency," § 605(b), except that the claim may be reviewed by an agency board of contract appeals under § 607(d) or by the U.S. Court of Federal Claims under § 609(a).  In either case, the appeal of the contractor's decision may be further reviewed by the U.S. Court of Appeals for the Federal Circuit. § 607(g); 28 U.S.C. § 1295.  "The purpose for centralizing the resolution of government contract disputes in [these fora], rather than in district court, is to ensure national uniformity in government contract law."  *Texas Health Choice, L.C. v. OPM*, 400 F.3d 895, 899 (Fed. Cir. Mar. 3, 2005).

Whether a claim such as Lockheed's is governed by the CDA depends whether it is "at heart a contract case."  *United States v. J & E Salvage Co.*, 55 F.3d 985, 989 (4th Cir. 1995).  The act encompasses more than causes of action that arise under contract law; rather, the language encompasses any disputes that "relate[] to a contract."  41 U.S.C. § 605.  Thus,

> It is well-established therefore that disguised contract actions may not escape the CDA.  Neither contractors nor the government may bring a contract action in federal district court simply by recasting claims in tort language or as some statutory or regulatory violation.

*J & E Salvage*, 55 F.3d at 988.

Lockheed is correct that not every case involving contractual issues is a disguised contract action or is "at heart" one of contract. *See Megapulse, Inc. v. Lewis*, 672 F.2d 959, 968 (D.C. Cir. 1982) (noting that "the mere fact that a court may have to rule on a contract issue does not . . . transform the an action . . . into one on the contract and deprive the court of jurisdiction"). *Megapulse*, for example, concerned a contractor that sued under the Trade Secrets Act to enjoin the government from disclosing allegedly proprietary information. *Id.* at 963. The government alleged that because the disclosure would also potentially violate a government contract, the claim was "tantamount to a request for specific performance" and thus fundamentally contractual. *Id.* at 970. The D.C. Circuit disagreed, holding that the action was not "contract-related" either in the source of the plaintiff's cause of action or in terms of its desired remedy, and that the district court therefore had jurisdiction. *Id.* at 968, 971. The key question was whether the government had violated the Trade Secrets Act, a statute unrelated to any contract, and the requisite remedy was to enjoin the government from doing so under the Administrative Procedure Act. *Id.*

This case is different from *Megapulse* in both respects that the D.C. Circuit considered important. First, unlike *Megapulse*, but like the disputes in *J & E Salvage* and *Texas Health Choice*, the instant action is fundamentally about (an admittedly broad set of) specific government contracts and how they are administered. It is in substance therefore "related to" Lockheed's government contracts. Second, Lockheed's requested relief is intimately related to its contractual rights, and its dispute can be resolved through the administrative CDA process. This Court addresses each of these premises in turn.

B

In *J & E Salvage*, the Fourth Circuit considered a suit brought by the United States against

a salvage company that had purchased supposedly-empty surplus cargo containers from the federal government, only to discover that the containers still contained military helicopter transmissions. 55 F.3d at 986–87.  The federal government sued the contractor under, inter alia, tort theories of conversion and replevin.  *Id.* at 987.  The district court assumed jurisdiction over the tort claims, but the Fourth Circuit reversed, holding that even though styled as a tort, the action was "essentially one of contract."  *Id.* at 988.  Whether the transmissions rightfully belonged to J & E or to the government, and thus whether J & E had committed a tort, depended on the terms of the contract dispute at issue.  *See id.*  The Fourth Circuit held that to permit tort claims so intimately related to government contracting issues to proceed in district court would "undermine[] the express intent of Congress to reduce and simplify disputes over the sale of surplus government property." *Id.* at 989. Additionally, the ability of related contractual issues to be heard in the Court of Federal Claims would create "inefficiencies involved in splitting an action between two different forums."  *Id.* Perhaps most importantly, the Court of Federal Claims "has specialized experience regarding the intricate world of government contracting"; Congress intended that even ancillary disputes relating to contracting fall within the purview of the Court of Federal Claims because such disputes often involve not just contract questions, but also questions about the scope of government authority and the construction of the myriad statutes and regulations pertaining to government contracting.  *See id.* at 990.

    All of these concerns apply with equal if not greater force to the instant case.  Even though Lockheed's allegations about DCAA's lack of authority to rescind Lockheed's direct billing status have been carefully crafted so that they do not sound in contract, they are intimately related to Lockheed's contracts and contractual disputes with the government.  Lockheed could not direct bill but for the existence of its contracts, and Lockheed's direct billing status would not be under any

threat but for Lockheed's dispute with the government about how LMGT performed its contract billing. Although the LMGT issue is not directly before this Court—and undisputedly cannot be directly before this Court—a determination of whether DCAA has authority to rescind Lockheed's direct billing status requires of necessity an inquiry into the reasons that DCAA proffers for rescinding that status, and therefore into the details of the LMGT dispute. Moreover, the precise issue that *is* before this Court—the scope of DCAA's authority—turns on the bureaucratic arcana of how the government administers and audits its contracts with its largest contractor, as evidenced by the alphabet soup of contracting acronyms that fills the parties' briefs. Both the LMGT contract issue and the DCAA direct billing issue fall squarely within the core competence of the Court of Federal Claims. This Court, mindful of Congress's clear intent to create an administrative system and court of government contracting experts to decide government contracting claims, is hesitant to invade the area of expertise of the Court of Federal Claims.

This hesitation is reinforced by the recent decision of the Court of Appeals for the Federal Circuit in *Texas Health Choice*, 400 F.3d 895 (Fed. Cir. Mar. 3, 2005). The posture of *Texas Health Choice* is closer to this case than is *J & E Salvage*: *Texas Health Choice* demonstrates that the basic logic of *J & E Salvage* applies equally well when the suit is for nonmonetary relief, is brought by the contractor, and concerns questions not of contract law but about the regulatory framework by which the government administers its contracts. In *Texas Health Choice*, a contractor brought an declaratory judgment action challenging the regulations concerning how government health care contracts were to be settled upon their termination. 400 F.3d at 897. The Federal Circuit held that the action fell within the exclusive province of the CDA and that the district court lacked jurisdiction; even though it was a challenge to a federal regulation, the dispute was "related to" a contract and was covered by the language of section 605 of the CDA, 41 U.S.C. § 605. *Id.* at 899.

12

Like the *J & E Salvage* court, the *Texas Health Choice* court noted that its broad construction of CDA jurisdiction comported with Congress's "purpose for centralizing the resolution of government contract disputes in the Court of Federal Claims": "to ensure national uniformity in government contract law." *Id.* That purpose would be thwarted if this Court were to assume jurisdiction in the instant case.

C

Lockheed argues that this Court must have jurisdiction because the injunctive relief it seeks is not available in the U.S. Court of Federal Claims, which can only provide money damages.[1] Lockheed also argues that the monetary losses it would suffer in lost interest payments can never be recouped in a suit for money damages, because "the 'no-interest rule' bars the recovery of interest on delayed or defaulted money payments from the government. *England v. Contel Advanced Sys., Inc.*, 384 F.3d 1372, 1377 (Fed. Cir. 2004). Furthermore, under the Tucker Act, the Court of Federal Claims cannot grant equitable relief. *See* 28 U.S.C. § 1491. Thus, under *Katz v. Cisneros*, 16 F.3d 1204 (Fed. Cir. 1994), and *Bowen v. Massachusetts*, 487 U.S. 879 (1988), Lockheed argues that the only forum in which it can obtain relief is a district court, and this Court has jurisdiction. Lockheed is incorrect for three reasons.

First, *Katz* and *Bowen* were not CDA cases, and therefore did not consider the extended grant of jurisdiction that the Court of Federal Claims has over CDA cases. By statute, the Court of

---

[1]Lockheed additionally tries to distinguish *Texas Health Choice* on the grounds that in *Texas Health Choice*, the contractor had received an adverse decision on a CDA claim from a contracting officer, whereas there has been no such decision in this case. P.'s Repl. at 8 n.8. This is irrelevant. The question this Court must consider is whether Lockheed *can* make a claim under the CDA, or whether this dispute falls outside the CDA's administrative process. If Lockheed can resolve its dispute through the CDA, then the fact that it has not begun to do so does not confer jurisdiction on this Court.

13

Federal Claims has

> jurisdiction to render judgment upon any claim by or against, or dispute
> with, a contractor arising under [the CDA], including a dispute
> concerning termination of a contract, rights in tangible or intangible
> property, compliance with cost accounting standards, *and other
> nonmonetary disputes* on which a decision of the contracting officer has
> been issued . . . .

28 U.S.C. § 1491(a)(2) (emphasis added).  The scope of DCAA's authority to rescind Lockheed's

direct billing status is an issue "related to" Lockheed's contracts and would be a "nonmonetary

dispute" that the Court of Federal Claims is empowered to resolve.  Although it is not for this Court

to determine the precise relief that the Court of Federal Claims is empowered to provide, the statute

is a clear statement of Congress's intent that the Court of Federal Claims' jurisdiction over CDA

claims not be limited to the purely monetary relief that Lockheed suggests is available.  Furthermore,

this Court observes that "[i]n any case within its jurisdiction, the [Court of Federal Claims] shall

have the power to remand appropriate matters to any administrative or executive body or official

with such direction as it may deem proper and just."  *Id.*  Even if such "direction" is not formally

an injunction backed by the contempt power of an Article III court, "direction" would presumably

encompass an instruction to the DCAA to maintain Lockheed's direct billing status.

Second, the power to avoid the revocation of direct billing status is in Lockheed's hands.

The government has stated that it will not revoke Lockheed's direct billing status if Lockheed

"voluntarily deduct[s] the withholding amounts from the vouchers for all impacted contracts" or

"voluntarily deduct[s] the withholding amounts . . . from [the vouchers for] just the larger contracts

at the larger locations."  P.'s Mot. exh. 8.  If Lockheed follows either of these suggestions and

deducts the disputed funds from its contract billings, then its ability to direct bill will continue

unharmed, it will suffer no interest losses, and its claim will be converted into a purely monetary one

for the disputed sums.

Finally, the CDA provides that "[i]nterest on amounts found due contractors on claims shall be paid to the contractor from the date the contracting officer receives the claim . . . until payment thereof."  41 U.S.C. § 611.  Thus, if Lockheed's direct billing status is in its view unlawfully revoked, Lockheed can forestall its losses on the time value of the delayed payments by filing a CDA claim with the contracting officer; if its claim is upheld, then it eventually will be paid the interest it would have earned on the delayed payments.

Thus, Lockheed's complaints about the DCAA's alleged abuses of its authority can and should be heard via the CDA disputes process, and Lockheed can procure the relief it seeks through the administrative process established by the Contract Disputes Act.  That process is Lockheed's exclusive remedy, and this Court lacks subject-matter jurisdiction.

IV

For the foregoing reasons, DCAA's Motion to Transfer to the Court of Federal Claims or, in the Alternative, Motion to Dismiss for Lack of Subject Matter Jurisdiction will, by separate order, be deemed withdrawn to the extent it is a motion to transfer, and will be in remaining part be granted.  Lockheed's complaint will be dismissed for lack of subject-matter jurisdiction.  The remaining motions will be denied as moot.

October 26, 2005                                        /s/
DATE                                            ROGER W. TITUS
                                          UNITED STATES DISTRICT JUDGE